Rosa **SIDBERRY**, 1017 Trinity Avenue., Tenants Association, Idis Rota, 1175 Clay Avenue Tenants Association, Juanita Sanchez, 444 West 167th St. Tenants Association, Frank Pomerico, 67 Hansen Place Tenants Association, and the Union of City Tenants, Plaintiffs,

v.

Edward I. KOCH, as Mayor of the City of New York, et al., Defendants.

No. 82 Civ. 344(MP).

United States District Court, S. D. New York.

May 14, 1982.

Bronx Legal Services Corp. by Andrew A. Scherer, New York City and Diane Morrison, Community Action for Legal Services, Inc. by Lucy Billings, New York City, for plaintiffs.

Frederick A. O. Schwarz, Jr., Corp. Counsel for City of New York by Jeffrey Schanback, and Steven M. Kaplan, New York City, for defendants.

## OPINION

MILTON POLLACK, District Judge.

■ The plaintiffs have moved for a preliminary injunction to restrain the defendants from putting into effect rent increases imposed upon the plaintiffs pursuant to the City's rent restructuring program for *in rem* housing.[1] Defendants have cross-moved for dismissal of the complaint under Fed.R.Civ.P. 12(b)(1) and 12(b)(6) or for summary judgment dismissing the complaint under Fed.R.Civ.P. 56. Three tenants and tenant associations have moved to intervene pursuant to Fed.R.Civ.P. 24. For the reasons stated hereafter, the motion to intervene will be denied, plaintiff's motion for a preliminary injunction will be denied, and defendants' motion for summary judgment dismissing the federal claims in the complaint will be granted and with them the pendent claims will also be dismissed and the restraint on rent increases consented to in the order of March 4, 1982 will be vacated.

### In Rem Housing

■ Pursuant to N.Y.Admin.Code Tit. D, § D17–4.0, (Supp.1981) New York City may foreclose the property of a landlord who is in arrears in his property tax payments for one year.[2] § D17–12.0(b) (1975) provides that upon such foreclosure and execution of a deed to the City:

> the city shall be seized of an estate in fee simple absolute in such land and *all persons*, including the state of New York, infants, incompetents, absentees and non-residents who may have had any right, title, interest, claim, lien or equity of redemption in or upon such lands shall be barred and forever foreclosed of all such right, title, interest, claim, lien or equity of redemption.... (emphasis added)

Housing taken over by the City in this fashion is known as *in rem* housing.

The City manages and operates *in rem* housing through its Department of Housing, Preservation and Development ("HPD"). Housing acquired through tax foreclosure is generally severely deteriorated and often represents a hazard to the surrounding community; the tenants are on

---

1. Plaintiffs had also moved for partial summary judgment under Fed.R.Civ.P. 56 on an issue involving centrally-managed ("CMP") buildings. Since the only plaintiff living in a CMP building, Rosa Sidberry, discontinued her action, that motion is mooted.

2. The period of delinquency was shortened from three years to one year in 1976.

the average considerably poorer than the tenants of non-*in rem* buildings.

HPD has three programs for dealing with *in rem* apartments and their tenants. The consolidation program is targeted at buildings with occupancy rates of less than 50%, lacking at least one essential service and where repair costs are higher than budget limitations allow. The City closes down such buildings and relocates the tenants to other City-owned property in nearby neighborhoods. Buildings that the City continues to operate are either centrally-managed by HPD ("CMP" buildings), i.e., the City directly pays all operation and maintenance costs and the tenants pay their rent directly to the City, or are under various Alternative Management Programs ("DAMP" buildings) whereby third parties such as community organizations, tenant associations, individuals and private real estate firms manage such properties and act as a liaison between the City and its tenants.

All three plaintiffs in this action are tenants of DAMP buildings and thus the other programs are not at issue.[3] The sources of funding for *in rem* buildings include federal funds from the Community Development Block Grant funds, ("CDBGs"), City of New York tax revenues, and *in rem* building rental revenues. DAMP buildings utilize CDBGs solely for capital improvements, major building systems rehabilitation and emergency repairs. Rent collections are the primary source of funds for operating and maintenance expenses.

*Rent Restructuring*

Defendants have been seeking for several months to raise the rents of the plaintiffs pursuant to a policy of restructuring rents in DAMP buildings in order to reduce the shortfall between the current rent revenues of a particular building and the costs of operation and maintenance of that building.

An ultimate goal of DAMP, (and indeed all *in rem* housing programs) is to make such buildings self-sufficient and to return them to the private sector.

Pursuant to N.Y.Admin.Code, Title Y, § Y51–3.0e2(f) (Supp.1981) and Title YY § YY51–3.0a(1)(a) (1975), housing owned or operated by public agencies are exempted from the rent control and rent stabilization laws respectively.[4] § Y51–5.0a(7) (Supp. 1981) and § YY51–3.3 (Supp.1981) further provide that housing acquired by the City through tax foreclosure and then sold to private interests other than the original landlord who had abandoned the building shall be subject to the rent control or rent stabilization laws at the last rents charged by the City.

Defendants concede that some of the increases sought pursuant to the rent restructuring program are in excess of those that would be permissible under the local rent control and rent stabilization laws. The defendants seek to raise the rents of the plaintiffs herein as follows:

> Plaintiff Idis Rota, resident of 1175 Clay Avenue, the Bronx, from $86 to $248
>
> Plaintiff Frank Pomerico, resident of 67 Hanson Place, the Bronx, from $95.20 to $190.00
>
> Plaintiff Juanita Sanchez, resident of 444 West 167th St., the Bronx, from $121 to $198.

*The Instant Litigation*

Plaintiffs filed suit on January 19, 1982 challenging the City's rent restructuring program on several grounds. Plaintiffs alleged, *inter alia*, that plaintiffs' rents were increased without notice or opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment; that the exemption for publicly-owned buildings

---

**3.** See fn. 1, *supra.*

**4.** § Y51-3.0e2(f) provides that rent control does not apply to:

Housing accommodations owned or operated by the United States, the state of New York, the city, or the New York city housing authority; or housing accommodations in buildings in which rentals are fixed by or subject to the supervision of the state commissioner of housing and community renewal. . . .

§ YY51–3.0a(1)(a) provides that rent stabilization shall not apply to dwelling units "owned or leased by, or financed by loans from, a public agency or public benefit corporation."

from the rent control and rent stabilization laws violates the Equal Protection Clause of the Fourteenth Amendment; that the level of rent increases violates the federal Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et seq.* (1976) pursuant to which the CDBG funds are obtained; that pricing of apartments at rates higher than the tenants can afford violates Article 17 of the New York Constitution which places a duty on the local government to assist the needy; and that despite the tax foreclosures the tenants have existing leases the terms of which have not yet expired.

On February 16, 1982, plaintiffs moved for a preliminary injunction to restrain defendants from charging or collecting the increased rents as having been imposed without prior notice and opportunity to be heard and from commencing with any eviction proceedings; the motion was based upon the purported likelihood of success on their due process claim.

On March 4, 1982, on consent of the City, this Court issued an order staying the City from evicting tenants for non-payment of rent increases pending this Court's determination of plaintiffs' motion for a preliminary injunction and defendants' cross-motion for summary judgment.

In their papers opposing defendants' motion for summary judgment, plaintiffs disputed defendants' contentions that the plaintiffs were given reasonable notice and opportunity to be heard on the rent increases. Accordingly, the Court decided that evidentiary hearings should be held to ascertain what procedures (whether constitutionally required or not) were followed.

5. Plaintiffs had denied, in their opposing affidavits, that they were given notice and opportunity to be heard. However, none of them took the stand to substantiate those denials.

6. Section 8 subsidies are obtained pursuant to § 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f (1976). The Section 8 program provides federally-funded assistance for multi-family projects with HUD-held or HUD-insured mortgages through direct cash assistance to eligible, low-income tenants.

*Resolution of the Factual Issues*

Upon receiving the testimonial and documentary evidence offered by the defendants, and uncontradicted by the one witness who testified on behalf of plaintiffs,[5] it is quite clear to the Court that it is a policy of DAMP, one followed in each of the buildings at issue here, that the tenants be given advance written notice of the rent increases in letters which also inform the tenants that Section 8[6] subsidies and other forms of public aid might be available and where to get such aid.[7] Further, pursuant to DAMP policy, several meetings with the tenants were held in all three buildings at which rent restructuring was explained and discussed, cost figures used in estimating the buildings' budgets and the rental revenues necessary to meet expenses were given, and tenant objections were voiced and listened to.

In the 444 West 167th Street building, (plaintiff Juanita Sanchez's building), vigorous tenant protest at a meeting held on July 30, 1981 against the proposed rent restructuring resulted in a postponement of the effective date of the increase from September 1, 1981 until January 1, 1982, and in a recalculation of the budget for the building and of the rent increases themselves. Plaintiff Sanchez's rent was originally scheduled to be increased up to $234; however, on the basis of the new budget it was increased to only $198 per month. A primary reason for delaying the restructuring was a decision by HPD, based upon the tenants' complaints concerning needed rehabilitation of the premises, to postpone restructuring until 95% of the rehabilitation was completed.

7. Notice of the specific rent increases were given to the tenants of 444 West 167th Street on November 24, 1981, for an increase to take effect January 1, 1982; to the tenants of 1175 Clay Avenue, November 30, 1981, for an increase to take effect January 1, 1982; to the tenants of 67 Hanson Place, December 29, 1981 for an increase to take effect February 1, 1982. In each case, prior to notice of the specific increase, the tenants were informed either by a letter or at a meeting that rents were to be restructured.

In the 1175 Clay Avenue building, (plaintiff Idis Rota's building), one of the plaintiffs' attorneys was present at a tenant meeting of December 16, 1981, at which cost figures were given out orally, the need for restructuring discussed, and available subsidies explained.

In 67 Hanson Place (plaintiff Frank Pomerico's building) the tenants upon receiving copies of the budget figures, objected to the room count upon which the budget was based. The number of rooms were resurveyed, the count was corrected, and budget revisions were made in response to this and other complaints. An alternative budget was prepared by the tenants and considered by the building's managers and though avowedly found unacceptable, it too prompted further revisions in the budget formulated by the managers.

A number of defendants' witnesses affirmed that it was also the policy of DAMP not to restructure the rents of any building which was lacking an essential service. None of the buildings in this litigation is now lacking in any such service.

*Resolution of the Legal Issues*

*1. The Motion to Intervene is Denied*

█ In order to establish intervention as of right under Fed.R.Civ.P. 24(a) it is necessary that a proposed intervenor show that:

> [I]ts application was timely, that it had an interest in the subject of the action, that disposition of the action might as a practical matter impair its interest, and that representation of its interest by existing parties might be inadequate.

*United States Postal Service v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978). In *United States Postal Service*, the Second Circuit in affirming the lower court held that the proposed intervenor's failure to show any inadequacy of representation was dispositive of the appeal from the District Court's denial of intervention. Here the proposed intervenors would be represented by the same counsel as are plaintiffs, and are tenants of DAMP buildings as are plaintiffs. They made no showing that the existing representation was insufficient to protect their interests which are identical to plaintiffs'.[8]

█ Permissive intervention under Fed.R.Civ.P. 24(b) is "wholly discretionary with the trial court," *United States Postal Service v. Brennan, supra*, at 191. As what is primarily at issue here is the constitutionality of an across-the-board housing policy, it is obvious that the proposed intervention would add little, if any, to the elucidation of the matter. Thus permission to intervene is denied.

*2. Even Assuming a Protected Property Interest, the DAMP Procedures Meet Due Process Requirements*

█ In order "to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. . . . He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Property interests are not created by the Constitution but rather "stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709.

█ The Court would be reluctant to hold that plaintiffs have a protected property interest in keeping their rents at the levels permitted under the rent control and rent stabilization laws. Housing which is owned by New York City clearly is exempt from rent control and rent stabilization laws, and the City's Administrative Code just as clearly provides that where a landlord does not pay his property tax, the City may foreclose upon that property—thus any expectation of a tenant in a multiple dwelling that one's rent would always be subject to the rent control laws would not appear to be well-founded.

---

8. Since it was decided that the rents of the tenants of 1272 and 1276 Clay Avenue would not be raised, only the tenant, Thelma Santia- go, of 1260 Clay Avenue and the tenant association of 1260 Clay Avenue have any possible interest at stake here.

Plaintiffs argue, however, that under *Burr v. New Rochelle Municipal Housing Authority*, 479 F.2d 1165, 1166 (2d Cir. 1973), "due process requires certain procedural safeguards before an across-the-board rent increase can be imposed by a municipal housing authority," and that the Fourteenth Amendment applies to the actions taken by defendants here. The question of whether HPD in operating *in rem* buildings is acting as a municipal housing authority is one requiring the interpretation of ambiguous local law,—i.e., HPD's charter, N.Y.City Charter, Ch. 61 (Supp.1981) which gives HPD the functions, *inter alia*, of rehabilitating public as well as private housing. To equate *in rem* ownership to ownership and operation of a multiple dwelling under a municipal housing authority would further entail a substantial intrusion by this Court on local housing policy. Fortunately, this Court need not reach that issue,[9] because even assuming that HPD is acting as a municipal housing authority, the requisites of *New Rochelle* have been fulfilled. The Second Circuit held in *New Rochelle* that:

> [D]ue process does not require an adversary hearing before a general rent increase or service charge can be imposed. We feel that the interests of the tenants, while concededly important, can be protected through a less formal procedure. Notice of a proposed increase in rent shall be served well in advance of the date for the increase. Opportunity for filing written objections shall be given. There need be no opportunity for oral presentation. The tenants or their representatives shall have the right to submit any material they consider relevant to disprove the need for the rent increase. Finally, the Review Board upon reaching a decision shall issue a statement outlining the reasons for either approving or rejecting the requested rent increase. The tenants may of course be represented by counsel. *Id.* at 1169–70.

As this Court found, pursuant to the DAMP policy of involving tenants and tenant groups in the operation of their buildings and in the rent restructuring program, each of the plaintiffs was informed by letter well in advance of the rent increase, and was given numerous opportunities to participate in meetings where rent restructuring and the need therefor were discussed, and where budget figures were given and tenant objections noted and considered. Indeed, the ongoing dialogue here between the DAMP managers and the tenants provides the tenants with protections exceeding those set forth in *New Rochelle*. Tenant input has already resulted in budget and rent modifications.

### 3. The Equal Protection Claim is Meritless

Housing is not a fundamental right, and classifications affecting housing are subject only to the "rational relationship" test,—i.e., whether the classification under attack is rationally related to legitimate purposes behind the statutory classification. *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972) ("We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality, or any recognition of the right of a tenant to occupy the real property of his landlord beyond the terms of his lease without the payment of rent or otherwise contrary to the terms of the relevant agreement.")

The rent control and rent stabilization laws were enacted to forestall private "profiteering, speculation and other disruptive practices tending to produce threats to the public health." N.Y.Admin.Code, Title Y, § Y51–1.0 (1975) (declaration and findings with respect to rent control law); N.Y. Admin.Code, Title YY, § YY51–1.0 (declaration and findings with respect to rent stabilization law). It is obvious that the City government was exempted because, as a non-profit entity, it was not perceived as

---

9. Nor the preliminary question of whether this Court should abstain in order to let the state court interpret HPD's charter and other relevant and unsettled questions of local law.

a contributor to the problem of rent-gouging. Further, those provisions of the Administrative Code permitting *in rem* buildings to be bought by private interests and subject to rent control and rent stabilization laws at the higher rents charged by the City, (provisions also attacked by plaintiffs as unconstitutional), §§ Y51–5.0a(7) (Supp. 1981), and YY51–3.3 (Supp.1981), were clearly attempts to allow the City, after rehabilitating these buildings, to return them to the market on a self-sufficient basis. Both legislative purposes—preventing rent-gouging and restoring buildings to a viable state in the private market—are patently legitimate, and the classifications involved here are rationally-related to those ends.

The issue of the constitutionality under the Equal Protection Clause of the Fourteenth Amendment of the City's exemption from the rent stabilization laws has in fact been addressed and decided by the state courts. In *Duchein and McNally v. Joy*, No. 24742/80 (Supreme Court, New York County Sept. 14, 1981), *aff'd mem., Duchein and McNally v. Joy*, 448 N.Y.S.2d 606 (App.Div., First Dep't 1982), the Court held in an Article 78 proceeding that:

> The New York City system of rent regulation is based on classifications. The legislature's determination that such rent regulations should not apply to apartments in buildings owned or operated by the municipality was a valid exercise of that body's power to determine what accommodations should be subject to rent regulation. *Slip op.* at 3.

4. *The Housing and Community Development Act of 1974 Claim Is Also Meritless*

▌ Plaintiffs argue that defendants have obtained CDBG funds pursuant to legislation designed to benefit low and moderate income persons, and that the rental increases sought would force low income persons out in violation of these purposes. However, 42 U.S.C. § 5301(c)(1) (1976) states as a purpose of the Act:

the elimination of slums and blight and the prevention of blighting influences and the deterioration of property and neighborhood and community facilities of importance to the welfare of the community, principally persons of low and moderate income.

Defendants use the CDBG funds in the DAMP buildings solely for capital improvements, i.e., to eliminate blight and preserve and restore the existing housing stock. Such usage fulfills a primary purpose of the Act and further is in no way related to the rental increases as those are sought to cover only operating expenses.

CONCLUSIONS

Even assuming that the plaintiffs have a property interest in preventing rental increase above a certain level, they have received more than the minimum procedural safeguards set forth in *Burr v. New Rochelle Municipal Housing Authority, supra*. The Equal Protection claim and Housing and Community Development Act claims are totally without merit. Accordingly, summary judgment in favor of defendants on the federal claims is appropriate.

▌ The federal law claims having been disposed of before trial, this Court in its discretion declines to exercise its powers of pendent jurisdiction. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Such an exercise would be particularly inappropriate here as the subject matter of the dispute,—housing preservation and tenants' rights—is so traditionally and clearly a concern of local government.

Accordingly, the motion to intervene is denied, plaintiffs' motion for a preliminary injunction is denied, summary judgment is granted in favor of defendants on plaintiffs' federal law claims and the remainder of the complaint is, in all respects, dismissed. The provisional consent order of March 4, 1982, staying the City from eviction of tenants for non-payment of rental increases is vacated. However, pursuant to the terms of that order, the parties in paragraph "4" thereof have agreed upon the time within which to make up the rent

differential and that understanding shall survive this order to pay the accrued rent.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a) Fed.R.Civ.P.

SO ORDERED.