OPINION OF THE COURT
Sheldon S. Levy, J.
Does the City of New York and its agencies, while acting as a landlord, have unlimited discretion to raise the rents of residential tenants in in rem housing? The subject matter has not been dealt with previously and is, accordingly, of first impression. Moreover, the present decision could potentially affect tens of thousands of tenants residing in such buildings.
By this article 78 proceeding, petitioners seek review and annulment of a determination of the Department of Housing Preservation and Development (HPD) by which *288 rentals in four tax foreclosed properties, located at 1171, 1175, 1179 and 1186 Clay Avenue in The Bronx, were increased by 50% to 108% per month.
The operative facts may be briefly set forth. Petitioners were tenants in subject apartment houses when their private landlords defaulted in property tax payments and the city took over (Administrative Code of City of New York, § D17-4.0). Thereafter, under HPD’s general management scheme, the properties in issue came under its division of alternative management programs (DAMP), which provides for daily building operation and management by third parties or by tenant associations under its private ownership and management program (POMP). In this case, the four buildings were leased to respondent Annal Management Company, Ltd., whose business is as its name implies, and were scheduled for transfer and sale to Annal in the summer of 1982. The rent increases here involved were in apparent contemplation of that sale.
The ultimate aim of the instant over-all program of HPD is to return abandoned residential buildings to nongovernmental proprietorship; to put them back on the tax rolls; and to recoup thereby some of the moneys expended by the city for repairs and renovations. However, when properties first become in rem, they are removed from all rent protections (Administrative Code, § Y51-3.0, subd e, par 2, cl [f]; § YY51-3.0, subd a, par [1], cl [a]). When transfer and sale back to private ownership finally occurs, properties, which had originally been sublet to either rent control or rent stabilization before gaining in rem status, become rent stabilized at whatever new rent levels have been then fixed by the city (Administrative Code, § YY51-3.3). As a practical matter, of course, the higher the rent roll of a building at the time of a city sale, the higher the sale price for the city.
The clear significance of this awesome city power to set current rents for in rem properties is that new private owners can secure thereby the benefits of rent augmentations far beyond what could have been obtained by prior landlords under rent control or stabilization. The city, however, should not be able so easily to subvert the clear intentions of legislative pronouncements, the plain indicia *289 of State-wide public policy and the obviously reasonable aspirations of its citizenry.
When the city becomes the landlord of such in rem buildings, or, alternatively, permits private management under its auspices, those who are lawful residential tenants upon the occasion of such conversion should not be left thereafter to the prevailing breezes of unbridled discretion. Whether or not these original residential tenants of in rem housing have a property right — by virtue of constitutional considerations, legitimate claims of entitlement, attornment or otherwise — they clearly have, at least, a property interest in their own apartment units sufficient to trigger in their favor even more important rights and protections afforded by both the State Constitution and the New York City Charter.
Accordingly, that intrusive institution of in rem land-lordship — although its ultimate objective is surely commendable and constitutional (see Sonmax, Inc. v City of New York, 43 NY2d 253) — must still be administered by the city with circumspection, with common sense and with due care and consideration for the basic constitutional, statutory and human rights of the tenants involved. This is particularly so, since such tenants, through no fault of their own, have frequently become victims of greedy and rapacious former landlords who have “milked” and then abandoned both buildings and tenants.
Unfortunately, it is the least affluent members of our society who are most often the residential occupants of in rem housing. In point of fact, the upshot of the subject rent raises (and which obviously will be sought hereafter in other similarly situated properties) will be effectively to force these low income and minority group tenants, some of whom have resided in subject buildings for over a decade, out of their homes; into a real estate rental market far beyond their means; and ultimately, perhaps, onto public assistance rolls. If the levying of these increases is without proper notice and a meaningful opportunity for the tenants to be heard or is without a decision-base premised on consistent, ascertainable and publicized standards, then the present determination of HPD is unauthorized and cannot be permitted to stand.
*290 In the instant case, petitioners were first officially alerted to expect unspecified monthly rent increases by a form letter dated October 30, 1981. One month later, another letter notified each tenant of the precise amount of the new rent set by HPD and announced the effective augmentation date as January 1, 1982. Thereafter, a single meeting between the tenants and officials of HPD was held on the evening of December 16,1981, at which several topics, including the necessity for and calculation of the increases, were discussed. Largely as a result of this meeting, at which no written memoranda, reports, exhibits or schedules were afforded to the tenants, the rent raises were postponed until February 1,1982, and Federal preliminary injunctive relief was sought by other tenants apparently not here involved. As a result of a Federal District Court determination that HPD’s procedures were not violative of the Federal Constitution, but that State constitutional standards specifically were not being considered (see Sidberry v Koch, 82 Civ 334 [SDNY, Pollak, J.]), the instant proceeding was brought.
Initially, it is clear that New York State constitutional safeguards and public policy may be interpreted and construed as being more protective of and responsive to the rights, liberties and needs of State citizens than Federal constitutional standards and national public considerations (see, e.g., People v Belton, 55 NY2d 49, 51; Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 159; People v Isaacson, 44 NY2d 511, 519-520; People ex rel. Walsh v Vincent, 40 NY2d 1049, 1050; People v Hobson, 39 NY2d 479, 483-484; People v Donovan, 13 NY2d 148, 151; Ives v South Buffalo Ry. Co., 201 NY 271, 317). The “unique language of the due process clause” of section 6 of article I of the New York State Constitution (Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 159-160, supra)-, the added provision relating to housing for low income persons (NYS Const, art XVIII, § 1); and this State’s long history of affording significantly enhanced due process protections to its own citizens, combine and buttress an independent construction for our State Constitution. This would seem particularly appropriate where the expectations of all tenants to decent, afforda *291 ble housing accommodations — the basic right of shelter for all human beings — is involved.
Further, the public policy of New York State favors participation in the determination of rent increases by tenants in both private and public housing (see Emergency Housing Rent Control Act, L 1946, ch 274, as amd; Public Housing Law, § 184, subd [b];Burr v New Rochelle Municipal Housing Auth., 479 F2d 1165). There is no reason in law, logic or practicality why in rem tenants should be treated differently from their public or private counterparts in this vital regard.
Equally pertinent, when a governmental agency acts as a landlord, it clearly should be subject to all of the due process requirements of law. “Once the State [or city] embarks into the area of housing as a function of government, that function, like other governmental functions, is subject to constitutional command” (Matter of Johnson v White Plains Urban Renewal Agency, 65 Misc 2d 293, 294; see, also, Matter of Vinson v Greenburgh Housing Auth., 29 AD2d 338, affd 27 NY2d 675). Moreover, even a transitory governmental landlord of in rem property must comport with constitutional standards.
Accordingly, a careful review of the submitted papers reveals fatal defects in HPD procedures in this case under both the State Constitution and the New York City Charter.
First of all, with respect to in rem housing generally, there has been a complete failure by HPD to promulgate any rules, regulations or clearly articulated guidelines before imposition of rent increases. Analogously, “[i]t hardly need be said that the existence of an absolute and uncontrolled discretion in an agency of government vested with the administration of a vast program, such as public housing, would be an intolerable invitation to abuse” (Holmes v New York City Housing Auth., 398 F2d 262, 265). Any distinctions between public and in rem housing must fail completely when government acts as landlord, and landlord excesses are evident. This must be especially so since, as noted earlier, in rem tenants lose all of the protections of rent control and rent stabilization legislation once the city has acquired the properties.
*292 Moreover, respondent Commissioner of the New York City Department of Housing Preservation and Development is vested with the function, power and duty to manage and superintend all real property acquired by the city for housing (New York City Charter, ch 61, § 1802, subd 7, par [c]; subd 8, par [b]), and the power to administer obviously mandates rulemaking (see, e.g., Morton v Ruiz, 415 US 199, 231). The purposeful default of respondents in establishing a clear policy for rent increases in in rem properties, which includes orderly, uniform and well-defined procedures and which is recognizably based on plainly annunciated rules, regulations or standards, is itself arbitrary, highly unreasonable, a denial of due process, and an abuse of discretion (see, e.g., Environmental Defense Fund v Ruckelshaus, 439 F2d 584, 598; Harnett v Board of Zoning, Subdivision & Bldg. Appeals, 350 F Supp 1159, 1161). Respondents’ lack, in this regard alone, requires judicial intervention.
Nor can respondent commissioner evade such administratively prescribed requirements by claiming that the subject increases are merely “directives”, unencumbered by the mandates of the charter. As one court previously characterized a similar attempt: “That, however, would be semantic sophistry” (Edenwald Contr. Co. v City of New York, 86 Misc 2d 711, 721, affd 47 AD2d 610).
Additionally, the mere statement by respondents’ attorneys that there are “criteria”, “parameters” and “procedures” for the increase of rent for in rem tenants does not make it so, and no delineated rules or regulations have been promulgated, noticed or published. Also, the mouthing of phrases, such as a “comparable buildings” and “industry-wide constants”, in the calculation of rent adjustment can serve no purpose where the submitted papers are completely devoid of detailed facts demonstrating their meaning and their use. Bare mathematical computations and prognostications will not suffice.
Furthermore, chapter 49 (§ 1105, subd b) of the New York City Charter specifically requires that any such rules or regulations, especially those “with respect to the fixing of charges” by an officer of a city agency, must be noticed and published and be permitted to be commented upon by *293 interested members of the public before adoption. The rent raises directed here plainly constitute a “fixing of charges”, but the charter provisions stand without compliance.
In addition, and particularly peculiar, is the fact that previously HPD (and its predecessor, the Housing Development Administration [HDA]) has not been shy in the formulation and issuance of a large and varied series of rules and regulations to carry out its function and duties (see rules and/or regulations relating to: city-aided limited profit housing companies; equal opportunity; housing assistance payments; J51 tax exemptions and abatements; loans to owners of multiple dwellings; partial tax exemptions for private dwellings; personal property of former tenants; rehabilitation loans; relocation assistance and relocation payments; restructured rents in rehabilitated buildings under government supervision; self-inspection of central heating plants; and tax lien determinations). The mere perusal of such a grouping eloquently demonstrates the appropriateness of rulemaking, especially when it pertains to the “fixing of charges” to the public (New York City Charter, ch 49, § 1105, subd b).
On this point, especially disturbing is respondents’ claim that adequate notice of the rent increases was provided to the affected tenants and that full explanation of the reasons therefor was also given. In the view of this court, no legally or constitutionally sufficient notice was afforded at all, and no full, fair or comprehensible exposition of the grounds for the expansive increases was furnished to the tenants involved.
The two written notices, sent a few months before the effective date of the rent increases, provided only a cursory warning of fait accompli rental augmentations and no details at all as to how the raises were determined or upon what standards they were based. Nor did the one-nightstand appearance — the single public meeting between tenants and HPD officials — serve to overcome the deficiency of proper and informative notice. Even a veritable genius would be hard pressed to understand any allegedly afforded oral explanation of the criteria for determining particular newly adopted rent charges. In fact, such a *294 meeting may fairly be described as merely “a close encounter of the absurd kind”.
At a minimum, tenants are entitled, as a due process requirement, to sufficiently detailed information to enable them to determine in a commonsense fashion whether any rent raises are warranted, and, if so, the grounds for such proposed increases and how they are to be calculated. Tenants must also be permitted a fair opportunity for meaningful input both as to the percentage of any initial rent augmentation and as to its legal and mathematical viability thereafter. Especially when the city is landlord, the city has, at least, a State constitutional obligation to comply with such basic notice requisites. Here, there was no adequate compliance at all.
Moreover, even in the few disclosed, generalized criteria, purportedly used in figuring upward rental adjustments, a variety of problems, questionable information and outright errors appear.
(1) Rents are apparently calculated on a per room cost basis, but nowhere is “room” defined for purposes of calculating rents (cf. New York City Rent and Eviction Regulations [promulgated by HPD], part 3, § 33.10, subd c, par [4]).
(2) The cost of carrying unrented apartments is claimedly spread fairly in each building among the tenants of occupied units, but no provision is made for a subsequent rent reduction when, as has occurred, such vacant apartments are rented to new tenants at market value.
(3) The fuel cost projection figure for the buildings appears to be overstated by from 4 to 30%, depending on the type of fuel consumed.
(4) The 10% management fee, presumably linked to total operations cost, will be materially affected by such errors or overstatements in basic budgeting costs, and upward rent adjustments, now sought for three of subject buildings, will apparently immediately provide an unexplained total surplus to the management company of over $3,400 beyond its stated, allowable percentage fee.
Nevertheless, in no manner should it be assumed, by virtue of the foregoing recital of problems and errors, that *295 respondents have provided petitioners or the court with even a fair semblance of adequate information upon which it can reasonably be determined how these rent increases were calculated. Summary figures, without explanation, cannot aid in the decision as to whether respondents’ determination is even supported by substantial evidence. On the contrary, all of the demonstrations submitted lead inescapably to the conclusion that respondents’ actions in formulating massive rent increases for in rem tenants without published rules, regulations, standards or guidelines; without proper and lawful notice; and without fair and adequate opportunity for tenant consultation, explanation and contravention, were arbitrary, unlawful, unreasonable and unconstitutional.
With respect, however, to petitioners’ assertions of warranty breach and lack of essential services, and concerning the past refusal of some petitioners to pay even nonaugmented monthly rental, there are proper and available forums for the resolution of such disputes, which facilities are well known to all parties and which are now being employed. Such claims have no bearing on the presently addressed controversy.
For all of the reasons stated, the petition is granted to the extent of annulling the determination of respondents, effective February 1, 1982, by which petitioners’ rental charges were increased; of staying respondents and their agents permanently from collecting or enforcing in any manner those particular rent raises; and of declaring HPD’s present procedures for determining rent increases for in rem tenants without promulgated guidelines, proper notice and adequate tenant consultation to be arbitrary, unreasonable, administratively unlawful and State constitutionally infirm. Additionally, the order of this court, dated July 30,1982, with respect to preliminary injunctive relief is now made permanent.