In the Matter of MARIA LAUREANO et al., Respondents, v EDWARD I. KOCH, as Mayor of the City of New York, et al., Appellants, et al., Intervenors.

First Department, March 20, 1984

APPEARANCES OF COUNSEL

*Michael Gage* of counsel (*Leonard Koerner* with her on the brief; *Frederick A.O. Schwarz, Jr., Corporation Counsel,* attorney), for appellants.

*Andrew Scherer* of counsel (*Susan Barrie, Lucy Billings, James E. Francis, IV,* and *Jean T. Schneider* with him on the brief; *Michael D. Hampden* and *John E. Kirklin,* attorneys), for respondents and intervenors.

OPINION OF THE COURT

ALEXANDER, J.

In this CPLR article 78 proceeding, commenced by the tenants of four buildings acquired by the City of New York pursuant to in rem tax foreclosures,[1] Special Term concluded that the determination of the respondent-appellant, New York City Department of Housing Preservation and Development (HPD) increasing the rents of said tenants effective February 1, 1982, was arbitrary, unreasonable, administratively unlawful and constitutionally infirm; annulled the determination and permanently enjoined HPD from collecting the increases (116 Misc 2d 287). Additionally, Special Term directed that before increasing rental charges to tenants of in rem housing, HPD was duty bound to promulgate and publish clearly articulated rules, regulations and standards respecting such increases, to provide affected in rem tenants with adequate prior notice of the increases, including a sufficiently detailed statement of the grounds upon which the proposed increases are based and how they are to be calculated, and to provide such tenants a meaningful prior opportunity to be heard.

HPD did not contest Special Term's annulment of the proposed rent increases, but sought renewal and reargument in respect to that portion of the court's judgment and order that directed the promulgation and publication of rules, regulations and standards pursuant to the city charter and the giving of adequate prior notice and a meaningful opportunity to be heard prior to increasing rental

---

1. New York City is authorized by section D17-4.0 of the Administrative Code of the City of New York to foreclose on properties whose real estate taxes are one year in arrears. Title vests in the city upon completion of the foreclosure proceedings and these properties, known as "in rem housing" are exempted from rent control and rent stabilization pursuant to section Y51-3.0 (subd e, par 2, cl [f]) and section YY51-3.0 (subd a, par [1], cl [a]) of the Administrative Code.

charges to in rem tenants. HPD argued that its procedures were administratively lawful, that the city charter does not require the promulgation and publication of rules and regulations in these circumstances and that their procedures were not violative of the due process clause of the New York State Constitution. A copy of the rent restructuring procedures that were to become effective March 3, 1983, in in rem buildings that were included in the Division of Alternative Management Programs (DAMP)[2] was submitted on the reargument/renewal application and has been included in the record on appeal.

Special Term denied reargument and renewal, and thus did not review the proffered procedures. It viewed their promulgation as HPD's attempt at compliance with the court's prior judgment, and held that such attempt was an inappropriate basis upon which to found a renewal/reargument application. Thus no full consideration was given to these rent restructuring procedures, nor was any determination made as to their adequacy from a "due process" perspective.

HPD has appealed from so much of the judgment below that held HPD's procedures for increasing rents in in rem buildings to be violative of the due process clause of the New York State Constitution and directed that HPD was required, pursuant to the New York City Charter, to promulgate and publish clearly articulated rules, regulations and standards respecting rent increases in in rem housing prior to increasing such rents. By order dated June 28, 1983, we granted leave to intervene in this appeal to in rem tenants who occupy other buildings in Brooklyn and The Bronx that are managed by various private management companies and for whom rent increases have been demanded.

---

**2.** DAMP is one of the programs undertaken by the city through HPD to deal with in rem buildings. Those with less than a 50% occupancy in which one or more essential services are missing are closed and the tenants relocated. Those which HPD continues to operate are either centrally managed with the tenants paying their rents directly to HPD and HPD paying directly all operating and maintenance costs or are alternatively managed under the DAMP program. Buildings in the DAMP program are managed by third parties, such as tenant associations, community organizations, individuals and private real estate firms. DAMP consists of the Leasing Bureau, which leases the building to the tenants pursuant to the tenant interim leasing program or to a 7A administrator under the 7A leasing program, and the Contract/Rehabilitation Bureau, which includes the private ownership management program (POMP) and the community management program.

Special Term rejected HPD's rent restructuring procedures, finding, *inter alia,* that "[w]hether or not these original residential tenants of in rem housing have a property right — by virtue of constitutional considerations, legitimate claims of entitlement, attornment or otherwise — they clearly have, at least, a property interest in their own apartment units sufficient to trigger in their favor even more important rights and protections afforded by both the State Constitution and the New York City Charter" (116 Misc 2d, at p 289). The court held (p 289) that because of this "property interest in their own apartment units", the in rem tenants were entitled to be protected against the "intrusive institution of in rem landlordship" with the resulting rent raises which will "effectively * * * force these low income and minority group tenants * * * out of their homes". The city therefore was obligated (p 291) "to promulgate * * * rules [and] regulations * * * before imposition of rent increases" both because of the requirements of subdivision b of section 1105 of the New York City Charter and the due process requirements of the New York State Constitution. The failure to do so, said Special Term, constituted a denial of due process and an abuse of discretion. The court was of the view that "[t]he rent raises directed here plainly constitute a 'fixing of charges'" and thus that "rules or regulations * * * must be noticed and published and be permitted to be commented upon by interested members of the public before adoption" (116 Misc 2d, at pp 292-293).

■ We disagree. The restructuring of rents in in rem housing does not constitute the "fixing of charges" under subdivision b of section 1105 of the city charter, such as would require the promulgation of rules and regulations in respect thereto, through the hearing and notice process prescribed by that section. Notably, neither Special Term nor the respondents and intervenors cite any authority for such a construction nor have we been able to discover any.

The DAMP program is essentially an experimental program designed to test whether community and tenant groups can successfully manage some of the distressed properties which have come under city ownership as a result of their owners apparently having found them unprofitable to operate, and consequently having defaulted in

their tax payments. A component of that successful management involves returning the properties to a self-sustaining operational basis. In order to achieve this goal, it is doubtless necessary to restructure the rents so as to increase the income of the property and to allocate a fair share of the cost of maintenance of the buildings to each apartment in the building. Property acquired by the city through in rem foreclosure, pursuant to section D17-4.0 of the Administrative Code of the City of New York, is expressly exempted from the provisions of the rent control and rent stabilization laws (Administrative Code, § Y51-3.0, subd e, par 2, cl [f]; § YY51-3.0, subd a, par [1], cl [a]), because "as a non-profit entity, [the City] was not perceived as a contributor to the problem of rent-gouging" " 'profiteering, speculation and other disruptive practices tending to produce threats to the public health.' " (*Sidberry v Koch,* 539 F Supp 413, 419-420.) Moreover, an integral part of the legislative scheme respecting in rem properties is to permit these buildings to be returned to the rental market on a self-sufficient basis, after they had been rehabilitated, at which time they again would be subject to rent control and rent stabilization (see Administrative Code, § Y51-5.0, subd a, par [7]; § YY51-3.3). These legislative purposes of "preventing rent gouging and restoring buildings to a viable state in the private market" are patently legitimate and are not violative of any constitutional proscriptions (*Sidberry v Koch, supra*).

The calculation of building related expenditures and the nature and extent of rent restructuring, if any, necessary to make an in rem building self-sufficient necessarily must depend upon the condition and history of the particular building. It would be unfeasible and inequitable, if not impossible, to standardize rents for all buildings throughout the DAMP program. Thus, the establishing of rents for a particular building does not constitute the "fixing of charges" such as would be involved in establishing a standard license fee or a standard fee for filing papers with the clerk of the court. (See *Acme Folding Box Co. v Finance Admin.,* 67 AD2d 689, 690.)

We turn then to the question of whether the procedures followed by HPD in restructuring rents, where necessary, of buildings involved in the DAMP program, accord with

such "due process" rights and requirements as may be triggered by the "property interest" in rem tenants have in their apartment units.

It is clear that no such "property interest" derives from the Federal Constitution such as would invoke the full panoply of due process rights thereunder, including an adversarial hearing for "[i]n order 'to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.... He must, instead, have a legitimate claim of entitlement to it.' *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct., 2701, 2709, 33 L.Ed.2d 548 (1972)" (*Sidberry v Koch, supra,* at p 418). The *Sidberry* court pointed out (at p 418) that "[p]roperty interests are not created by the Constitution but rather 'stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits'. [*Board of Regents v Roth,*] *Id.* at 577, 92 S.Ct. at 2709".

And just as in rem tenants have no Federal constitutionally protected interest in their apartments as would give rise to a legitimate expectation that their rents would be kept at the levels permitted under rent control and rent stabilization laws (*Sidberry v Koch, supra*), they likewise have no such right under State law. (See Administrative Code, § Y51-3.0, subd e, par 2, cl [f]; § YY51-3.0, subd a, par [1], cl [a].)

This is not to say, however, that " 'decent, safe and adequate low-rent * * * housing at rents low income tenants can afford is [not] an interest of the nature which merits due process protection' " (*Burr v New Rochelle Municipal Housing Auth.,* 479 F2d 1165, 1169).

The *Burr* court quoted with approval from the opinion of the Court of Appeals for the District of Columbia in *McKinney v Washington* (442 F2d 726, 727) where that court said "[t]he financing of a low-rent housing program, which sometimes necessitates the raising of rents, is a very complicated operation requiring a high degree of expertise * * * In many cases it is only too probable that participation by tenants in rental decisions and review by the courts would cause senseless and damaging delays." The *Burr* court held (*supra,* p 1170) that "due process" did not

require an adversary hearing before a general rent increase or service charge could be imposed and felt that "the interests of the tenants, while concededly important, [could] be protected through a less formal procedure." "Due process" requirements would be satisfied if there was service of a notice of a proposed increase in rent well in advance of the date of the increase, an opportunity to the tenants for filing written objections and the right to the tenants or their representatives to submit material they considered relevant to disprove the need for the rent increase.

The procedures for rent restructuring of these city owned in rem properties essentially accord with these precepts. They entail substantial tenant involvement and provide adequate prior notice of such increases as are found to be necessary. Indeed, an in rem building must make application to be included in the DAMP program. To be eligible to participate in both, the tenant interim leasing program and the 7A leasing program, at least 70% of the tenants must join in the application. They are made fully aware that entry into the program may involve restructuring of the rents which may occur upon admission of the building to the program, during its participation and/or upon disposition. In the tenant interim leasing program, where the goal is the ultimate sale of the building to the tenants in occupancy, the restructuring is based upon a tenant-proposed budget while in the 7A leasing program, the rent restructuring is based upon a budget which is proposed by the 7A lessee in conjunction with the tenants. While the rent restructuring may entail increases over the rents previously paid by the tenant, where such an increase creates a substantial financial hardship, existing Federal and municipal rental assistance programs are made available to qualified tenants. It appears that these assistance programs are fully utilized, so that there has been little disruption of tenant occupancy.

Thus, to the extent that tenants of the in rem housing which is a part of the DAMP program have a "due process" protected right to notice of and an opportunity to "have meaningful participation in the determination of rental increases" the rent restructuring procedures of HPD appear to be adequate.

We conclude, therefore, that the order of the Supreme Court, New York County (SHELDON LEVY, J.), entered on March 18, 1983, which denied HPD's application to reargue and/or renew an article 78 petition pursuant to which a judgment and order (one paper) dated and entered November 26, 1982, which, *inter alia,* directed that prior to increasing rental charges to in rem tenants, HPD must promulgate and publish clearly articulated rules, regulations and standards respecting such increases should be reversed, on the law, and renewal granted, and upon renewal the judgment of November 26, 1982 is modified, on the law and on the facts, without costs, to the extent appealed from, and the injunction prohibiting HPD from proceeding under its rent restructuring procedures, made effective March 3, 1983, to determine, collect and enforce rental increases from tenants of in rem housing is vacated.

The appeal from the judgment and order (one paper), Supreme Court, New York County (SHELDON LEVY, J.), entered November 26, 1982, is dismissed, without costs, as subsumed by the order and judgment of that court dated March 18, 1983.

KUPFERMAN, J. P., SANDLER, FEIN and MILONAS, JJ., concur.

Order, Supreme Court, New York County, entered on March 18, 1983, is unanimously reversed, on the law, and renewal granted, and upon such renewal, the order and judgment (one paper) of said court, entered on November 26, 1982, is modified, on the law and on the facts, without costs and without disbursements, to the extent appealed from, and the injunction prohibiting HPD from proceeding under its rent restructuring procedures, made effective March 3, 1983, to determine, collect and enforce rental increases from tenants of in rem housing is vacated. The appeal from the order and judgment (one paper) of said court, entered on November 26, 1982, is dismissed, without costs and without disbursements, as having been subsumed in the appeal from the order entered on March 18, 1983.