OPINION OF THE COURT
Philip S. Straniere, J.
Petitioner, William DiScala, commenced this summary proceeding against the respondent, Facilities Development Corporation for the Office of Mental Retardation and Developmental Disabilities Staten Island Developmental Center, seeking a judgment awarding the petitioner possession of the premises 490 Buel Avenue, Staten Island, New York, 2nd floor. A trial was originally scheduled for May 21, 1997 and was adjourned by the parties on several occasions. Each of the parties made motions to dismiss the other’s pleadings. Both sides were represented by counsel. Petitioner’s attorneys withdrew as counsel for the landlord effective March 5, 1998 with the consent of the court. It was agreed to give the petitioner until June 1, 1998 to obtain new counsel and submit any additional papers at that time. The court has not been notified that the petitioner has retained new counsel; therefore, it will decide the issues on the merits based on the papers submitted.
As this proceeding involves the lease of a residential facility in a private home to be occupied by persons with developmental disabilities, several important issues were raised by the parties that must be addressed.
findings of fact
Background: On November 25, 1991 a written agreement was entered into between “Dr. Vincent DiScala as the Landlord” and the “People of the State of New York, acting by and through their agent, The Facilities Development Corporation, pursuant to the Mental Hygiene Law as the Tenant”, for the lease of the “Main Apartment of 2 Family Residence (75% of BLDG)” located at 490 Buel Avenue, Staten Island, New York. The term of the lease was to be five years, beginning on June 1, 1991 and terminating on May 31,1996. The court notes *359 that the lease was not executed until November 25, 1991 by the landlord. The date the representatives of the tenant signed the lease is not set forth anywhere in the document. Nor is there any indication that the lease term was delayed from the June 1, 1991 starting date. The issue is further confused by the fact that the landlord’s petition has the date of the written lease as September 25, 1991.
The written lease, at paragraph 3, provided for rent for the first year to be $17,460 annually, to be paid in 12 monthly installments of $1,455. This paragraph indicates that the rent for years three to five is set forth in the rider at paragraph 63. The rent for year three was set at $18,333 annually or $1,527.75 a month; and for years four and five, $19,249.65 annually or $1,604.14 a month. Amazingly, nowhere in the written lease is there any provision for the rent in year two. Since there is no claim for any rent due and owing, the court is assuming that all rent, including the use and occupancy during the holdover period, that is, after June 1, 1996, was paid. It is also presumed that the parties agreed to continue the monthly use and occupancy at $1,604.14 during the holdover period starting June 1, 1996. The petition alleges this amount as the monthly rent due and has the date of that payment amount commencing September 25, 1991, a date inconsistent with the rental schedule of the written lease.
The lease, at paragraph 6, provides that any holdover after the termination of the lease or renewal thereof shall create a month-to-month tenancy based on the terms and conditions set forth in the lease. Since there is no indication that the lease was renewed, effective June 1, 1996 the tenancy became month-to-month. (Paragraph 5 of the lease entitled “renewal” has been deleted from the agreement.)
On March 14, 1997 the petitioner caused to be issued a 30-day notice to quit addressed to the respondent herein as tenant and “John and/or Jane Doe one through five”, as undertenants, terminating their tenancy as of April 30, 1997. Although the actual residents of the premises are named only as “John Doe” and/or “Jane Doe”, there is no affidavit of service of the 30-day notice upon them.
On May 2, 1997 the petitioner caused to be issued a notice of petition and petition naming the respondent as the tenant from whom the landlord sought to recover possession of the premises. There is no mention of the actual occupants of the premises as either tenants or undertenants. The affidavits of service of the pleadings filed by the petitioner are solely on the *360 Facilities Development Corporation and the Dormitory Authority of the State of New York. There is no indication of any attempt to serve any of the occupants.
On January 27, 1998 the petitioner filed a motion to amend the caption to change the name of the petitioner from William DiScala to Sami Duka and Zanep Duka as the Dukas had purchased the premises from William DiScala on June 20, 1997. The respondent did not object to this change in the name of the petitioner. Petitioner, in that same motion, asked that the named respondent be substituted for the “Office of Mental Retardation and Developmental Disabilities”. The court is puzzled by this request, since the named respondent has been the Facilities Development Corporation for the Office of Mental Retardation and Developmental Disabilities Staten Island Developmental Center on the lease, the 30-day notice and the notice of petition and petition. Perhaps, as explained below, the petitioner meant to substitute the Dormitory Authority of the State of New York as the respondent.
In the interest of linguistic economy the agencies involved will be referred to as follows: Facilities Development Corporation (FDC); Office of Mental Retardation and Developmental Disabilities (OMRDD); Staten Island Developmental Center (SIDC); and the Dormitory Authority of the State of New York (DASNY).
ISSUES PRESENTED
A. Who is the Petitioner?
The landlord, as set forth in the lease agreement of November 1991, is listed as Dr. Vincent DiScala. The 30-day notice and the pleadings in this action list the landlord as William DiScala. There is no evidence or allegations as to how title to the property devolved into William DiScala from Vincent DiScala. Apparently, only the court is concerned about this, as the respondent did not raise this issue as a defense in the action. Finally, the property was sold in June 1997 to Sami Duka and Zanep Duka. Again, no evidence is submitted to substantiate this fact; however, the respondent did not contest this or seek to put the petitioner to his proof on this issue.
Further, the respondent has not raised as potential defenses defects in that the petition was brought by the attorney in the name of the petitioner as his agent, and in the verification, which fails to state why the attorney verified the petition and not the landlord (RPAPL 741; CPLR 3021).
*361 Since there has been no objection by the respondent, the court concludes the proper petitioner has commenced this action.
B. Who is the Proper Respondent?
In trying to determine who is the proper respondent, the court is reminded of the words of the King of Siam in Rodgers and Hammerstein’s “The King and I” when he said “[i]s a puzzlement?” The jacket of the lease delineates the tenant as being the FDC for OMRDD, SIDC. The respondent argues that the FDC is not a proper respondent since it is clearly the “agent” for OMRDD, a conclusion that is to be reached apparently because the lease uses the word “for” before indicating OMRDD. The word “agent” is never used in the lease as applying to the relationship between these two agencies. Respondent further argues that the DASNY is now the proper respondent since, by statute some, if not all, of the FDC’s activities in this regard were transferred to DASNY. The respondent does not indicate how the landlord would obtain that information, since there is no evidence that any entity involved gave such notice to the landlord that the lease was amended in that regard. The court supposes that the respondent is relying on the old adage “[i]gnorance of the law is no excuse” (Thomas Jefferson, letter to Andre Limozin, Dec. 22, 1787) since, if the obligation of the agencies under the leasé was changed by statute, the petitioner, in theory, would be charged with such knowledge.
In spite of respondent counsel’s attempt to clarify the issue, the court is faced with the fact that the preamble to the lease identifies the tenant as “The People of the State of New York, acting by and through their agent, the Facilities Development Corporation, pursuant to the Mental Hygiene Law.” Nowhere in its papers is this denomination of the tenant asserted by respondent as being required by the lease when the landlord gives notice to the tenant. The signature block of the lease is signed, “The People of the State of New York, tenant, by Facilities Development Corporation, Agent”.
In further contradiction of the language of the preamble and the jacket is paragraph 26 of the lease, which requires all notices under the lease to be addressed only to the Facilities Development Corporation at 44 Holland Avenue, Albany, New York, to the attention of the Director of Real Property. Additionally, paragraph 45, entitled “service of process”, applies only to service on the landlord. There is no provision in the lease for service upon the respondent.
*362 A review of the applicable statutes, done in an attempt to unravel this matter, reveals that the Office of Mental Retardation and Developmental Disabilities is established by title C of the Mental Hygiene Law (Mental Hygiene Law § 13.01 et seq.). Pertinent to the current situation is Mental Hygiene Law § 13.11 (c), which states: “[t]he commissioner may, within the amounts appropriated therefor, lease space of facilities in which services for the mentally retarded and developmentally disabled are to be provided. He may delegate this authority to the facilities development corporation.” (The commissioner is defined at Mental Hygiene Law § 13.03 as the head of the Office of Mental Retardation and Developmental Disabilities.) Since the lease agreement was apparently negotiated by FDC, it can be presumed that the “may” in the statute has become a “must”, although there is no document establishing the FDC’s authority to execute the lease.
The Staten Island Developmental Disabilities Services Office is established pursuant to Mental Hygiene Law § 13.17. The name of the entity was changed from Staten Island Developmental Center, as it is designated in the lease, to the Staten Island Developmental Disabilities Services Office by an amendment to the statute effective December 31, 1988. Interestingly, the respondent drafted this lease three years after the change of name went into effect and used the wrong entity in the document. Yet, respondent seeks to charge the petitioner with knowledge of the change in the name of the managing authority from the FDC to DASNY.
As pointed out by the respondent’s counsel, effective September 1, 1995 the functions of the FDC were transferred to DASNY pursuant to Public Authorities Law § 1699-d et seq. Section 1699-f provides that DASNY succeeds to the right, title, interest liabilities and obligations of the FDC. This would mean that the DASNY assumed whatever the relationship the FDC had, if any, with the landlord pursuant to the terms of the lease. DASNY would now be the agent for the People of the State of New York. The intent of the statute is not to alter the rights and obligations of the FDC and third parties such as the landlord herein to any agreements existing on the date of the change. At the most, the failure to properly name DASNY as a respondent is an amendable matter. There is no prejudice to the respondent, since the respondent by statute has assumed the obligations of the FDC, including performance of the terms of the lease and the duty to defend claims made thereunder.
The petitioner has named the correct respondent. The lease required that notice be given to the FDC, the entity which *363 was served with process. Since the tenant is “The People of the State of New York” and that entity can only exist through one of its agencies, the naming of the agency designated in the lease as the agent for the tenant is all that was required in the pleadings for the court to acquire jurisdiction over the respondent if served in conformity with statute.
C. Do the Occupants of the Premises Have to be Named as Respondents?
The general rule is that when a summary eviction proceeding is commenced, all persons with rights of possession must be named in the petition as respondents. Persons with an independent right to possession who have been transferred possessory rights from the prime tenant must be named in the petition if the landlord wants to evict these individuals. Although the occupants of the premises do not qualify under the standard definition as “subtenants”, they do derive their right to occupancy not directly from the landlord, but from the respondent State agencies involved. When subtenants are in possession of the premises they must be named as respondents if the prime tenant is sued for possession for any reason (Teachers Coll. v Wolterding, 77 Misc 2d 81 [App Term, 1st Dept 1974]; Lippe v Professional Surgical Supply Co., 132 Misc 2d 293 [Civ Ct, Queens County 1986]).
The lease establishes that the purpose of the agreement was to provide a residential facility for persons with developmental disabilities. The Mental Hygiene Law has recognized the obligation of the People of the State of New York to provide for life’s essentials and protect the interests of persons classified as disabled under this statute. OMRDD has, as one of its functions, to provide decent housing facilities for persons with disabilities (Mental Hygiene Law § 13.01). The landlord leased the premises in question to the State to provide a residence for developmentally disabled persons. At the time the litigation arose there were at least four individuals residing at the premises. Although the 30-day notice listed “John Doe” and/or “Jane Doe” one through five, the landlord made no attempt to serve a copy of the notice on the occupants. In addition, no attempt was made to serve the occupants with the notice of petition and petition. Since it was the lives of these persons that would be affected by the awarding of possession of the premises to the landlord, it was imperative that these persons receive notice of the proceeding. If the landlord did not know the names of these individual tenants he could have and should have served “John Doe” notices on them.
*364 These persons were necessary parties to the landlord obtaining the relief being sought in the proceeding. If, in fact, some or all of these persons lacked the competency or ability to defend themselves in this action then the court would have to take whatever steps necessary to protect their individual rights, including the appointment of guardians ad litem for them (CPLR art 12). Conceivably, the interests of these persons could be adverse to that of the tenant State agency. The State may find it to its benefit to relocate the individual when the nature of the person’s disability might be aggravated by such a move or that individual may have adjusted to living and working in the community so that relocating could cause a substantial disruption of that person’s life and adversely affect his or her mental health and general well-being, and be in derogation of the State’s obligation to him or her. For this reason, it is imperative that these persons receive notice of the proceeding and have their interests represented in the litigation, either by the appointment of a guardian ad litem, if none exists, or by delivering notice to the legal guardian of that person.
Further, since OMRDD placed the individuals in that residential setting, it is familiar with and knowledgeable about each occupant’s unique disability and condition. The State, as the tenant, has a legal obligation to give notice of the litigation to the occupants or their parents or guardians or to have provided the information to the landlord so that process could be issued and the court made aware of the names of these persons and independently determine if they are capable of defending themselves or if the State, as the tenant, was adequately representing their interests. Mental Hygiene Law § 41.41 sets forth certain rights for persons diagnosed as mentally retarded or developmentally disabled. It states that: “1. Each person who resides in a community residence has the same basic and legal rights as all other persons of the same age. Such rights are in no way diminished by the fact that such persons who are mentally retarded or otherwise developmentally disabled live in a community residence.
“2. In order to ensure that such residents are able to lead a life of dignity, the commissioner shall include in rules and regulations promulgated for community residence a statement of the rights of persons living in such community residences which shall include, but not be limited to:
“(a) The right to request an alternative residential setting, either a new residence or change in roommates, and to be involved in decisions regarding such changes * * *
*365 “(r) The right of the resident, their parents or guardians, to be informed of the resident’s rights under law and regulation, and the guaranty that such rights shall not be abridged”.
The intent of this legislation is to treat persons with disabilities the same as any other citizen to the greatest degree possible. The statute has placed an affirmative burden on the State, through the commissioner, to protect the rights of these individuals. Included in these protections are all legal rights and issues affecting housing accommodations. Therefore, if the State as a tenant is involved in a landlord-tenant proceeding the State, or in this case OMRDD, has an obligation to notify the actual occupants of the home of the litigation and give them an opportunity to appear and participate in the proceedings. This obligation exists on the State independent of the actions taken by the landlord to serve process on the occupants. The failure of the landlord to give statutory notice to the occupants will affect his ability to obtain the relief sought in the petition since he has failed to join necessary parties. The State’s obligation to notify the occupants of the home exists independent of the landlord’s legal procedural obligations to the occupants.
The petitioner’s action must be dismissed for failure to serve the notice of petition and petition or in any manner give notice of this proceeding to the actual occupants of the premises. The fact that they are persons with disabilities residing at the premises owing to a lease having been entered on their behalf by an agency of the State of New York does not relieve the landlord from attempting to notify them of the proceeding in a manner consistent with RPAPL article 7. (Metalsky v Mercy Haven, 156 Misc 2d 558 [Sup Ct, Nassau County 1993].)
“ ‘The fundamental requisite of due process of law is the opportunity to be heard’ * * * And the ‘right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest’ ” (Greene v Lindsey, 456 US 444 [1982]).
D. Is This Action Prohibited by the Doctrine of Sovereign Immunity?
Respondent contends that the Civil Court of the City of New York lacks the subject matter jurisdiction to hear this case. Respondent asserts that since the State is protected by the doctrine of sovereign immunity it can only be sued if it waives that right. The respondent further claims that even if the court *366 should determine that the State has waived the doctrine of sovereign immunity, the sole forum available for the petitioner would be the Court of Claims. For the reasons stated below, the respondent’s contention must be rejected.
The lease prepared by the respondent specifically, by its terms, waives any claim of sovereign immunity. Paragraph 44 provides: “Disputes involving this lease, including the breach or alleged breach thereof, may not be submitted to binding arbitration (except where statutorily authorized) but must, instead be heard in a court of competition jurisdiction of the State of New York.” The State has, by this clause, agreed that all disputes arising under the lease will be decided in court provided the court has the subject matter jurisdiction to hear the particular matter.
This is a clear and unequivocal waiver of the doctrine of sovereign immunity and the petitioner has the right to commence a summary proceeding against the State of New York and the agencies named herein.
E. Does the Civil Court Have the Subject Matter Jurisdiction to Hear This Matter?
Respondent argues that, in the alterative, should the court determine that the doctrine of sovereign immunity has been waived, the proper court for this action is the Court of Claims. This position of the respondent is also not tenable.
The FDC, the signatory of the lease, is a creature of statute, title 13-A of McKinney’s Unconsolidated Laws of NY (Facilities Development Corporation Act; L 1968, ch 359, § 1, as amended [Act]). Section 4412 of McKinney’s Unconsolidated Laws of NY (Act § 12) provides certain rules and regulations in regard to actions by and against that corporation. It states: “1. The state supreme court shall have exclusive jurisdiction of any action, suit or special proceeding brought by or against or involving the corporation. The venue of any action, suit or special proceeding brought against the corporation shall be laid in the county of Albany.” Since the FDC signed the lease on behalf of the State, the statute clearly removes all litigation against the FDC to the Supreme Court. The Court of Claims is not a proper forum.
The respondent, however, points out that the proper party is the DASNY and not the FDC. The DASNY is also a creature of statute, having been formed pursuant to article 8, title 4 of the Public Authorities Law. Actions against the DASNY are permitted by Public Authorities Law § 1691; however, nothing in that section limits either the jurisdiction or venue of any *367 such action. Further, Public Authorities Law § 1678 grants the DASNY the power to sue and be sued. Again, here too, there is no limiting language which would support the respondent’s contention that the Court of Claims is the proper forum. There has, in fact, been a finding that the DASNY is not subject to a defense of sovereign immunity (Matter of Dormitory Auth. [Span Elec. Corp.], 18 NY2d 114 [1966]). Since the DASNY is the proper party to this action owing to the Legislature transferring the FDC functions to it, any court competent to hear the underlying claim can entertain a suit involving the DASNY.
A review of the Mental Hygiene Law finds no reservation by the Legislature of a requirement that the Court of Claims or any other particular forum retain jurisdiction over actions arising as a result of the State carrying out the mandates of the statute. As a matter of fact, the clear and convincing language of the law establishes that the purpose is to keep as much activities of the agencies charged with carrying out the mandates of the Mental Hygiene Law as possible local in nature and to afford persons with disabilities the opportunity to participate as much as they are able in decisions that affect their daily lives.
The position of the respondent in this regard would require that the action perhaps be brought in a venue such as Albany County, thereby effectively denying the occupants of the premises the ability to participate in the process in a meaningful manner. Any litigation that would set the venue of the action in a locale that would not be accessible to these individuals owing to distance or inconvenience of the witnesses to attend would be of doubtful constitutionality.
New York State Constitution, article VI, § 15 creates the Civil Court of the City of New York and grants the court jurisdiction “over summary proceedings to recover possession of real property and to remove tenants therefrom and over such other actions and proceedings, not within the exclusive jurisdiction of the supreme court, as may be provided by law.” (NY Const, art VI, § 15 [b].) In addition, RPAPL article 7 provides that “[a] special proceeding to recover real property may be maintained in a county court, the court of a police justice of the village, a justice court, a court of civil jurisdiction in a city, or a district court” (RPAPL 701 [1]). (Similar language granting Civil Court such jurisdiction is found in. CCA 204.) The venue for such an action shall be the jurisdictional area of the court in which the real property is located (RPAPL 701 [2]). Although the statute does not give jurisdiction for summary proceedings *368 specifically to the State Supreme Court, the case law has held that as a court of general jurisdiction, the Supreme Court has concurrent jurisdiction for such matters (Matter of Mahshie v Dooley, 48 Misc 2d 1098 [1965]; Matter of Piccione, 106 Misc 2d 898, revd 85 AD2d 604, revd 57 NY2d 278, rearg denied 58 NY2d 824 [1983]).
The clear intent of the Legislature in passing RPAPL 701 with a list of five courts of limited jurisdiction was to show a distinct preference that summary proceedings be brought in those forums. (Matter of 3505 Realty Corp. v Weinberger, 41 Misc 2d 254 [Sup Ct, Bronx County 1963]; Matter of Piccione, 57 NY2d, supra, at 290.) Recognizing that there are very few issues that are more local in nature than that of landlord and tenant, the Legislature chose these courts as the more desirable jurisdiction for summary proceedings and related actions. The Civil Court, being one of these sites and handling thousands of these cases each year, has acquired an expertise in its Judges and administrative staffs that allows for an expeditious determination of landlord-tenant disputes. Although the Supreme Court would have jurisdiction over the matter, it does not address the issues raised in summary proceedings to the same degree as Civil Court. Further, the cost of commencing an action in Supreme Court is almost five times that of Civil Court, a factor that might discourage many landlords or tenants from utilizing that forum.
The Civil Court has the jurisdiction to decide the issues of this case, since neither the Supreme Court nor the Court of Claims has retained exclusive jurisdiction over the issues and neither have the parties contractually agreed to resolve disputes between them in a particular forum.
F. Was Process Properly Served on the Respondent?
Respondent has argued that the landlord has failed to effectuate service of process upon it and has not complied with CPLR 307 which provides for personal service upon the State. Respondent alleges that the petitioner failed to serve an Assistant Attorney-General as required by that statute. CPLR 307 (1) states: “Personal service upon the state shall be made by delivering the summons to an assistant attorney-general at an office of the attorney-general or to the attorney-general within the state.” Subdivision (2) of that rule provides for personal service upon a specified officer of a State agency if such service is required by statute.
The lease agreement between the parties, at paragraph 26, addresses the issue of notice between the parties. It states, *369 “any notice by Landlord to Tenant shall be deemed to be given if mailed by registered or certified mail addressed to Facilities Development Corporation, 44 Holland Avenue, Albany, New York 12208-3411, Attention: Director of Real Property.”
Petitioner has submitted affidavits of service of the notice to quit on both the Facilities Development Corporation and the Dormitory Authority by registered mail. The service on the FDC was to the address set forth in the lease for notice. The service on Richard Wynne for the DASNY was at its New York City office. There is no affidavit of service upon the Attorney-General. Further, the affidavit of service by mail is defective on its face. It states that the notices were mailed “on the 14th day of 19th day of March 1997”; if there were no other problems with this proceeding, at a minimum a traverse hearing would have to be held to determine the actual date of service. It is interesting to note that the petitioner served the DASNY with the notice, but did not name the DASNY as a party. Since the lease did not require such notice, why was this done?
The petitioner also filed with the court affidavits of service of the notice of petition and petition on the DASNY by personal service on an assistant counsel in Delmar, New York, and by certified mail on the FDC at the designated address and the DASNY at its New York City office. Again, no affidavit of service was filed in regard to the Attorney-General.
As stated above, CPLR 307 (2) provides for service of process on a State agency by delivering the summons to such officer or a designated agent or by mailing a copy by certified mail, return receipt requested, to such officer. The front of the envelope used must bear the legend “URGENT LEGAL MAIL”. In addition, personal service must be made on the State as set forth in subdivision (1) of CPLR 307. Since the petitioner has not indicated that the certified mail was labeled as required by the statute and no service was made on the Attorney-General, the court lacks personal jurisdiction over the named respondents. Service on the Attorney-General is necessary in this case, even if the State of New York is not a named party.
CPLR 403 (c) requires that the notice of petition and petition in a special proceeding, which includes a summary proceeding, be served in the same manner as a summons. Although the RPAPL provides for its own methods for service of process in summary proceedings, it does not contain any language that would indicate how service is to be made upon a State agency. Nor do the facts of this case indicate that service of the pleadings was attempted in a manner consistent with the RPAPL so *370 as to bring the issue of the adequacy of notice to the respondent into question.
Interestingly, it should be pointed out that paragraph 45 of the lease sets forth methods for service of process. However, it only applies to actions brought by the tenant against the landlord. It seeks to create a method of service in addition to those allowed under the CPLR. Under the common-law theory of mutuality of obligation, the court could impose the same methods of service upon a tenant in actions by the landlord. The lease allows for service on the landlord by certified mail, return receipt requested, the procedure the landlord used to serve the tenant these pleadings. However, since the tenant is a State agency, and the Legislature has set forth the methods of service permissible upon such entities, the parties cannot by contract alter those statutory methods. They could require additional methods for notice but they cannot create replacements for those prescribed by the Legislature.
Finally, there was absolutely no attempt to notify the actual occupants of the premises of the litigation by either the landlord or the tenant.
For the above reasons, the action must be dismissed. The court has failed to acquire personal jurisdiction over either the named parties or all the necessary parties.
G. Does the Attempt to Evict Developmentally Disabled Tenants Violate Public Policy or the Legal Rights of Those Individuals?
Respondent argues that there are public policy and other legal reasons not to evict the tenant since the tenant was acting on behalf of certain individuals that actually occupied the premises. Respondent alleges that because the occupants are developmentally disabled, they cannot be adequately placed in new residential settings in a 30-day period as demanded in the notice to quit. This may, in fact, be true but as a legal position this assertion of the respondent is patently absurd.
First, the occupants of the premises were placed pursuant to a written lease negotiated by the respondent on behalf of the individuals. In fact, the lease is on a form prepared by the respondent. The lease is for a five-year term. It contains no provision, however, for any renewal and indicates that at the end of the term the respondent would become a month-to-month tenant (para 6). Respondent, with full knowledge that it was leasing the premises as a residence for persons with dis *371 abilities, could have negotiated either a renewal period or some additional time to vacate upon receipt of notice from the landlord of a desire to regain possession of the premises. Since none of these steps was taken, Real Property Law § 232-a governs the situation. This statute requires that the tenant be given a minimum of 30 days’ notice of the termination of the lease when a month-to-month tenancy exists. The court notes that the paragraph denoted “renewal” was deleted from the lease.
Second, Mental Hygiene Law § 13.01, in its declaration of policy, states: “The state of New York and its local governments have a responsibility * * * for the comprehensively planned provision of services including care, treatment habilitation and rehabilitation of their citizens with mental retardation and developmental disabilities.” In order to provide these services the Legislature has authorized the appropriate commissioner to provide housing for persons with disabilities in community settings (Mental Hygiene Law § 13.15). Further, in order to carry out its own mandate to close “Willowbrook”-like developmental centers, the Legislature authorized the creation of developmental disabilities services offices to meet the needs of the State’s developmentally disabled population. The statute, Mental Hygiene Law § 13.17, provided for the creation of the Staten Island Developmental Disabilities Services Office. The Legislature charged these various agencies with the duty to establish programs and policies for the placement of residents into community residence programs (see, L 1991, ch 409, § 16, as amended by L 1992, ch 258, § 1; L 1993, ch 223, §1).
Nothing in any of this legislation passes the burden of protection of the rights of the developmentally disabled on to the public in general or any individual in particular. The responsibility is solely with the State, its agencies and eleemosynary organizations for which it contracts to provide certain services. The State, in negotiating this lease with the petitioner, included no terms and conditions that would grant the occupants of the premises any more rights than any other residential tenant. Although in some quarters such equal treatment of these individuals might be applauded, in reality, these persons most likely lack the ability to protect their own rights and must rely on their parents or guardians, and the State to do so.
For the respondent to now seek to add a public policy burden on the landlord to give the State additional time to relocate *372 these occupants is disingenuous at best and shows a substantial breach of the respondent’s duties to these individuals. Respondent’s failure to affirmatively take steps to protect these persons in the event a holdover proceeding was commenced against the tenant places this protected class of individuals at the mercy of the court system. As sympathetic as this or any other court might be to the plight of the occupants, since this is a holdover proceeding the greatest length of time of any possible stay of a warrant of eviction is six months (RPAPL 753; Matter of New York City Hous. Auth. v Gantt, 57 Misc 2d 447 [1967]). The knowledge of what the real life effect would be on these individual occupants by failing to negotiate additional terms into the lease is obvious to anyone with the least bit of common sense and it is beyond comprehension that the persons negotiating this lease failed to protect the occupants’ rights in this regard.
Respondent has argued that at least one of the tenants is a “Willowbrook Class” client and pursuant to a permanent injunction issued in New York State Assn. for Retarded Children v Cuomo (US Dist Ct, ED NY, index No. 72 Civ 356, 357), she must be moved to an alternate placement equal to if not better than their existing accommodations. Again, this consent decree is between the State of New York and OMRDD as the defendant and the plaintiff. The landlord herein is not a party to the decree and nowhere in the lease is he acknowledging or has he consented to be bound by the court order. This decree, as does the legislation referred to above, applies to the State and not the petitioner. If the rights of the occupants are adversely affected by the actions of the landlord in obtaining a warrant of eviction of the tenant and the occupants, the State is responsible for that result by failing to adequately protect the rights of the occupants and would be liable for damages to these individuals, if any, or sanctions for failing to comply with the Federal court order.
The landlord is within his legal rights to bring an action to recover possession of the premises through a holdover proceeding. Any responsibility for potential adverse effects on the occupants of the house are the responsibility of the State. The court, and the public in general, would hope that a landlord in this situation would be cognizant of the unique problems the occupants of the premises might face if forced to move without proper preparation, and that he would seek to exhaust all avenues to resolve any disputes that might lead to the eviction of the tenant and the occupants. However, he has no legal duty *373 to refrain from asserting the rights that he and every other landlord has in this situation. The State has the obligation to protect the rights of these individuals and should have prepared for a contingency when the landlord might require to recover possession of the premises.
H. Is the Landlord’s Only Remedy to Bring a Claim That His Property Has Been Taken by the State?
The respondent claims that the petitioner’s only recourse, assuming that he has personal jurisdiction over the proper respondent, would be to commence an action in the Court of Claims alleging that the State has evidenced an intent to remain in possession of the premises for an indefinite period of time and therefore it has made a de facto appropriation of his property (EDPL 501 et seq.). This defense .asserted by the respondent rises to the level of “chutzpah”.
The respondent would have the court sanction a situation whereby, pursuant to a written lease, a landlord in good faith rents real property to the State, the State refuses to vacate the property, holds over beyond the end of the term and now claims that the landlord’s only redress is not a summary proceeding to return him to possession, but an action to be compensated because there has been a de facto taking of the property by the State. What landlord in his right mind would ever enter into any agreement with the State knowing that such a scenario is a possible result? The landlord enters into a lease relationship of his property and now finds that he may lose title to it to the tenant. Interestingly enough, the eminent domain clause in the lease prepared by the respondent provides that in the event there is a taking by a condemnation proceeding, the lease is terminated and the obligation of the State to pay rent ceases. The lease makes absolutely no mention of a situation where the triggering event of the eminent domain procedure is the tenant refusing to leave. If the State seeks to assert such a right, then it had an obligation to disclose it to the landlord in the lease, so that there could be a knowledgeable consent to such a possibility.
If the State is seriously asserting such a legal position, it is severely limiting the pool of residential placement sites available to it on a lease rather than outright purchase basis. Such a position may well be in violation of the Legislature’s mandate under the Mental Hygiene Law.
To allow the State to assert such a position flies in the face of equity and contract law. It allows the tenant to breach the
*374 terms of the lease and by doing so vitiate all rights the landlord had to recover the property by legal proceeding, leaving him with “just” compensation only for his property. Such a result cannot be sanctioned. This defense is dismissed.
I. Has the State Violated the Due Process and Equal Protection Rights of the Occupants of the Premises?
Although the court alluded to this issue above, the serious implications of the State’s failure to notify the occupants of this litigation violates their rights under both the United States and New York State Constitutions. Clearly, there is the issue of the landlord’s obligation in this regard which the court discussed above, a situation which can be addressed by the court on a case-by-case basis in light of the rules set forth in the CPLR and RPAPL. What makes the current situation unique is the fact that the State of New York has negotiated the lease for these persons and it decided which individuals to place at the residence. The courts have recognized that “[o]nce the State embarks into the area of housing as a function of government, that function, like other governmental functions, is subject to constitutional command” (Matter of Johnson v White Plains Urban Renewal Agency, 65 Misc 2d 293, 294 [1971]; see also, Matter of Vinson v Greenburgh Hous. Auth., 29 AD2d 338, affd 27 NY2d 675 [1970]).
The New York State Constitution states: “No person shall be deprived of life, liberty or property without due process of law” (NY Const, art I, § 6) and “No person shall be denied the equal protection of the laws of this state or any subdivision thereof’ (NY Const, art I, § 11). Although the State Constitution does not designate persons with disabilities as a protected class per se, these individuals are, in fact, “persons” and entitled to the same constitutional protections as all other individuals and as individuals with a disability the occupants are protected from discrimination in the assertion of their civil rights by the State or any agency or subdivision thereof (Civil Rights Law § 40-c [2]). All persons within the jurisdiction of this State shall be entitled to the equal protection of the laws of this State or any subdivision thereof (Civil Rights Law § 40-c [1]). “[I]t is clear that New York State constitutional safeguards and public policy may be interpreted and construed as being more protective of and responsive to the rights, liberties and needs of State citizens than Federal constitutional standards and national public considerations * * * and this State’s long history of affording significantly enhanced due process protections to its *375 own citizens, combine and buttress an independent construction for our State Constitution.” (Matter of Laureano v Koch, 116 Misc 2d 287, 290, revd 100 AD2d 192, revd 64 NY2d 1105 [1985].)
The Legislature has recognized the need to protect persons with disabilities by granting them special status pursuant to the New York State Human Rights Law (Executive Law § 290 et seq.). Among the areas in which protection is afforded is that of housing accommodations. Executive Law § 296 (5) (a) provides that:
“It shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right to sell, rent or lease a housing accommodation, constructed or to be constructed, or any agent or employee thereof:
“(1) To refuse to sell, rent, lease or otherwise to deny to or withhold from any person or group of persons such a housing accommodation because of * * * disability * * * of such person or persons.
“(2) To discriminate against any person because of* * * disability * * * in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith.”
Although the language of the statute on its face appears only to apply to the initial entering into the agreement to either rent or buy a premises, to permit the institution of a summary proceeding based on an individual being a member of the protected class or to fail to give notice of a proceeding to a protected individual in such a situation would reduce the statute to meaningless words. Surely the Legislature did not intend to create a situation whereby a landlord could evict a tenant who became disabled after entering into possession of the housing accommodation from the premises without invoking the protections of this statute.
This legislation gives further support to the finding that the Due Process and Equal Protection Clauses of the New York State Constitution required not only the landlord but also the State of New York to have given notice to the occupants of the premises of the pending summary proceeding.
CONCLUSIONS OF LAW
Petitioner’s petition is dismissed for failure to obtain personal jurisdiction over the respondent and for failure to *376 name necessary parties, the actual occupants of the premises. The State of New York has a duty independent of that of the landlord to notify occupants of premises leased for persons with developmental disabilities of any litigation that would adversely effect those persons’ living conditions.
Finally, it is ironic that over 25 years after Jane Kurtin, a reporter from the Staten Island Advance, disclosed the horrid conditions at the Willowbrook State School, here in our community (sorry Geraldo Rivera, let’s give credit where credit is due), we are still dealing with the legal issues generated from those revelations.